ans

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,      )
                                  )
          Plaintiff,       )
                                  )
      vs.                 )     Case No. 04-40106-01/02-JAR
                                  )
ANTHONY G. GRIFFITH       )
and                            )
REBECCA PRICE,          )
                                  )
         Defendants.    )
_____)

## MEMORANDUM AND ORDER DENYING DEFENDANT'S MOTIONS FOR SUPPRESSION, MOTION TO DISMISS, MOTION FOR A BILL OF PARTICULARS, MOTION TO SEVER, AND MOTION FOR RETURN OF PROPERTY

This matter is before the Court on defendant Anthony Griffith's Motion to Suppress Evidence and Statements (Doc. 23), Motion for Bill of Particulars (Doc. 24), Motion to Sever (Doc. 25), Motion to Suppress Statement (Doc. 26), Motion to Dismiss for Destruction of Evidence (Doc. 27), and Motion for Return of Property (Doc. 28).  The Court granted defendant Rebecca Price's Motion to Join in Motions filed by Griffith, and therefore she joined all previously mentioned motions except the Motion to Suppress Statement (Doc. 26); Price also filed a Motion to Suppress Statements (Doc. 44). The Court held an evidentiary hearing on the motions on February 17, 2005.  Subsequently, the Court requested supplemental briefing from the parties on the issue of whether the affidavit for the search warrant provided sufficient temporal nexus and whether the good faith exception applied in this case.

The Court has reviewed the evidence and pleadings and is ready to rule.  For the reasons set forth below, the motions are denied.

*Background*

On March 24, 2003, deputies from the Coffey County Sheriff's Department executed a search warrant at the defendants' residence in Burlington, Kansas.  The search warrant was largely based on a deputy sheriff's recovery, on March 23, 2003, of a trash bag that contained items indicative of methamphetamine manufacture and use.  The trash bag also contained items that linked Rebecca Price and Anthony Wales, a name also used by Anthony Griffith, to the address where the search was conducted.

*Analysis*

Defendants move to suppress their statements and the evidence seized during the search warrant.  Defendants also move for a bill of particulars, severance of their trials and a return of the property seized.  The Court will address each motion in turn.

**1.  Motion to Suppress Evidence**

**A.  The Search Warrant**

Defendants assert that the information in the search warrant affidavit failed to provide probable cause to search their house.  They argue there was not sufficient information to link the items found in Gridley, Kansas, to their residence in Burlington, Kansas at the time of the search.

Reviewing courts give "great deference" to the issuing magistrate's determination of probable

cause.[1]  The court's duty is to ensure that the issuing magistrate had a "substantial basis" for concluding that the affidavit in support of the search warrant established probable cause.[2]  "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."[3]  The test is whether the facts presented in the affidavit would "warrant a man of reasonable caution" to believe that evidence of a crime will be found at the place to be searched.[4]  Thus, only a probability and not a prima facie showing is the standard for probable cause.[5]

### The Affidavit

Thomas Johnson, a Deputy with the Coffey County Sheriff's Office and the Eastern Kansas Criminal Interdiction Task Force, was the affiant of the affidavit in support of a warrant to search the defendants' residence.  In the affidavit, Johnson related that he is experienced in identifying major criminal activity including the sale, distribution, packaging, use, and concealment of drugs and other illegal contraband.  Johnson further stated that based on his knowledge and experience, he knew that clandestine laboratories produce methamphetamine in numerous ways; and that there were certain chemical ingredients, precursor reagents, solvents and catalysts commonly used, and that the manufacturing process requires "chemical storage containers, reaction vessels, heating and cooling

---

[1]*United States v. Finnigin*, 113 F.3d 1182, 1185 (10th Cir. 1997).

[2]*United States v. Nolan*, 199 F.3d 1180, 1182 (10th Cir. 1999) (citing *Illinois v. Gates*, 462 U.S. 213, 236 (1983)).

[3]*Id.*

[4]*Id.* (citing *Texas v. Brown*, 460 U.S. 730, 742 (1983)).

[5]*Id.* (citing *Gates*, 462 U.S. at 235).

devices, and equipment to isolate and purify the controlled substance."[6]   Deputy Johnson additionally

described the general procedure for producing methamphetamine and described what one who

maintains a clandestine methamphetamine lab generally possesses.

Deputy Johnson related the following factual basis for a warrant to search the defendants'

residence in Burlington, Kansas.  On March 23, 2003, Deputy Ron Peterson was dispatched to a

location in Gridley, Kansas, that he was informed was a possible methamphetamine lab dump site.

When Deputy Peterson arrived at the location, he found a clear plastic trash bag sitting on the

Northwest side of a small creek bridge, which from his training and experience he believed to be from

the clandestine manufacture of methamphetamine.   Deputy Peterson seized the trash bag and its

contents, and took it to the Coffey County Annex for testing and evidence collection.  The following

day, March 24, Deputies Johnson and Peterson reopened the bag and inventoried its contents, which

included: a book entitled "The Secrets of Methamphetamine Manufacture by Uncle Fester;" plastic

bottles of acid; Coleman fuel; acetone; rubber gloves; plastic tubing; propane bottles; and numerous

items of paraphernalia used for the inhalation of narcotics.  There were approximately 250 pieces of

aluminum foil with burnt residue, commonly seen with the use of methamphetamine, as well as 14 plastic

baggies with corners cut from them, which are used for packaging narcotics.

Deputy Johnson's affidavit further stated that deputies tested the substances in various bottles

with "PH paper," which indicated that some of the substances were acidic.  The deputies' field tests

also resulted in positive reactions for anhydrous ammonia in the Coleman fuel can; and the affidavit

---

[6]*See* Attach. A Def.'s Mot. to Suppress Evidence & Statements.

4

further explained that bluish/green corrosion on the brass fittings on the can was probably caused by anhydrous ammonia.  The affidavit explained that anhydrous ammonia is used in one of the methods for manufacturing methamphetamine.  The deputies also did a PH test on a pinkish/white powder found in the trash bag.  This powder tested as neutral and the deputies suspected that it was the binder used in pseudoephedrine pills.  Deputy Johnson's affidavit further explained that in the manufacture of methamphetamine, pseudoephedrine or ephedrine tablets are ground up and the pseudoephedrine or ephedrine is then separated or extracted from the binder and other ingredients of the tablets.  Deputy Johnson's affidavit further stated that among the contents of the trash bag was a glass jar with a lid altered with plastic tubing, commonly called a gas generator, which is routinely seen in the manufacture of methamphetamine.

Deputy Johnson's affidavit further stated that in addition to the items indicative of methamphetamine manufacture, use and packaging, the trash bag contained: three envelopes addressed to Rebecca Price or Rebecca D. Robinson at an address in Burlington, Kansas; a prescription pill bottle with the name Rebecca D. Price at this same address; and a Sears credit  card in the name of Anthony Wales.  Deputy Johnson's affidavit further stated that Coffey County Sheriff's Department records showed that as of April 21, 2001, Anthony Wales lived at the same address as the address on the Sears credit card, the prescription bottle and the envelopes addressed to Rebecca Price.

Deputy Johnson further stated in the affidavit that he knew from his training and experience that the objects found in the trash bag are commonly used for the manufacture of methamphetamine, and that based on the totality of the information, he was confident that illegal drugs and items used for the manufacture of methamphetamine were at the address in Burlington, Kansas.

### *Timeliness of the Information in the Affidavit*

The affidavit sufficiently established the requisite "nexus between the objects to be seized and the place to be searched" from which "a person of reasonable caution" would "believe that the articles sought would be found" there.[7]  But the affidavit is virtually silent regarding the age of the trash found at the dump site in Gridley.  The affidavit states that Deputy Peterson was dispatched to the location and found the trash bag on March 23; this was the day before the search warrant was obtained.  The affidavit, however, does not state whether the person who caused Deputy Peterson to be dispatched to the location in Gridley, provided any information regarding how long the trash bag had been at the location.  The affidavit states that among the contents of the trash bags were items bearing the name of Rebecca Price and the name of Anthony Wales.  But the affidavit does not identify the date, if any, on the prescription bottle, nor the date, if any, on the envelopes addressed to Rebecca Price.  Nor does the affidavit identify the expiration date, if any, on Anthony Wales's credit card.  In fact, the only temporal information in the affidavit, is the affiant's statement that as of April 21, 2001, some two years before the search warrant, the subject address had been identified as the residence of Anthony Wales.

On this basis, defendants argue, there was no evidence in the affidavit upon which the magistrate judge could find that contraband or evidence of a crime would be found at the residence *at the time of the search*.  This Court agrees.  For, "[p]robable cause to search cannot be based on stale

---

[7]*See United States v. Hargus,* 128 F.3d 1358, 1362 (10th Cir. 1997); *United States v. Reno,* 196 F. Supp. 2d 1150, 1158 (D. Kan. 2002) (stating that this nexus "may be established through . . . normal inferences as to where the articles sought would be located," and "courts often rely on the opinion of police officers as to where contraband may be kept.").

information that no longer suggests that the items sought will be found in the place to be searched."[8] And a determination of timeliness "depends not merely on the passage of time but on the nature of the criminal activity, the length of the activity, and the nature of the property to be seized."[9]  The staleness doctrine is based on the notion that probable cause may dissipate over time.[10]  Because the affidavit was silent as to how long the trash may have been at the location,[11] the affidavit provides no information from which a judge could determine whether the information gleaned from the trash bag was fresh information or stale information.  In other words, the affidavit provides no information which could indicate to a judge, the probability that evidence of methamphetamine use, manufacture or packaging, was going on at the residence at the time of the search warrant.

The government argues that it was reasonable to infer that the trash bag had not been at the location very long, because authorities were called by someone suspicious of the bag; and that it is reasonable to infer that someone who was suspicious of the bag would have called authorities right away.  Even if these are reasonable inferences, they merely lead to an inference that the person called authorities soon after the person *discovered* the trash bag at the dump site.  Without knowing the identity of the person who called authorities, without knowing their familiarity with this rural location

---

[8]*United States v. Snow*, 919 F.2d 1458, 1459 (10th Cir.1990) (citing *United States v. Shomo*, 786 F.2d 981, 983 (10th Cir.1986)).

[9]*United States v. Smith*, 63 F.3d 956, 960 (10th Cir. 1995), *vacated on other grounds by* 516 U.S. 1105 (1996) (citing *United States v. Snow*, 919 F.2d 1458, 1460 (10th Cir. 1990)).

[10]*United States v. Miles*, 772 F.2d 613, 616 (10th Cir.1985) (citing *United States v. Johnson*, 461 F.2d 285, 287 (10th Cir.1972)).

[11]Such information might have been available from the person who made the call that resulted in Deputy Peterson being dispatched to the dump site.  Or, perhaps the dates on the mail, the prescription bottle and the expiration date on the credit card might have provided some information suggesting how recently this trash had been discarded from the residence.

7

near Gridley, Kansas, and without knowing whether this person could approximate when the trash bag first appeared at the location, one cannot reasonably infer that the trash bag had been recently *discarded* from the subject residence. Even if a reasonable magistrate could infer that the trash bag was recently discovered by someone who called authorities on March 23, there is not sufficient information in the affidavit from which a reasonable magistrate could infer that the trash bag was recently discarded. In fact there is no information in the affidavit from which a reasonable magistrate could infer the approximate time frame that the trash bag was discarded. Thus, from the four corners of the affidavit, this Court concludes that the search warrant was not supported by probable cause.

### Good Faith Exception

Even if the affidavit did not contain probable cause to allow the search, the Court believes that the officers acted with "objective good faith" in obtaining the warrant from the magistrate and in executing the warrant within its scope, pursuant to *United States v. Leon*.[12]  In *Leon*, the Supreme Court pronounced "that suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule."[13]  "The engine that drives Fourth Amendment protection is prevention and deterrence."[14]  Thus, "where the officer's conduct is objectively reasonable," that is, the officer acts with "objective good faith" in obtaining the warrant from a magistrate and in executing the warrant

---

[12] 468 U.S. 897 (1984).

[13] *Id.* at 918.

[14] *United States v. McCarty,* 82 F.3d 943, 949 (10th Cir. 1996), *cert. denied,* 519 U.S. 903 (1996).

within its scope, "there is no police illegality and thus nothing to deter."[15]  It is the "magistrate's

responsibility to determine whether the officer's allegations establish probable cause."[16]  In the ordinary

case, the officer cannot be expected to question the magistrate's probable cause determination."[17]

Indeed, there is a "'presumption created in *Leon* that when an officer relies upon a warrant, the officer

is acting in good faith.'"[18]

In determining whether to apply the *Leon* exception, the:

> 'good faith inquiry is confined to the objectively ascertainable question
> whether a reasonably well trained officer would have known the search
> was illegal despite the magistrate's authorization . . . .'  To answer this
> 'objectively ascertainable question,' we are to consider 'all of the
> circumstances,' and assume that the executing 'officers have a
> reasonable knowledge of what the law prohibits.'[19]

"[T]he reviewing court must examine 'the text of the warrant and the affidavit to ascertain

whether the agents might have reasonably presumed it to be valid.'"[20]  The determination is not merely

whether the affidavits contain legally sufficient facts but whether the affidavits are devoid of factual

support.[21]  "Thus, 'it is only when [an officer's] reliance was wholly unwarranted that good faith is

---

[15]*Leon,* 468 U.S. at 919-921.

[16]*Id.* at 921.

[17]*Id.*

[18]*United States v. McKneely,* 6 F.3d 1447, 1454 (10th Cir. 1993) (quotation omitted).

[19]*United States v. Dahlman,* 13 F.3d 1391, 1397 (10th Cir. 1993), *cert. denied,* 511 U.S. 1045 (1994) (quoting *United States v. Leary,* 846 F.2d 592, 607 (10th Cir. 1988) (quoting in turn *Leon,* 468 U.S. at 919)).

[20]*McKneely,* 6 F.3d at 1454 (quotation omitted).

[21]*Id.* (citing *United States v. Cardall*, 773 F.2d 1128, 1133 (10th Cir. 1985)).

absent.'"[22]  The government, not the defendant, bears the burden of proving that its agents' reliance

upon the warrant was objectively reasonable.[23]

   In addition to the facts stated in Deputy Johnson's affidavit, evidence presented at the

suppression hearing established the following.  Deputy Peterson, who responded to the dispatch on

March 23, is a methamphetamine lab specialist.  Upon recovering this trash bag containing items he

believed were the discarded trash of a methamphetamine lab, Deputy Peterson called Deputy Johnson,

who is also a methamphetamine lab specialist  and together they inventoried the contents of the trash

bag.  It was reasonable for Deputy Johnson, the affiant, to infer that Deputy Peterson recovered the

trash bag after being dispatched to the location shortly after someone called authorities to report a

possible methamphetamine lab dump site.[24]  Furthermore, it was reasonable for Deputy Johnson to

infer that there was cause to believe that the contents of the trash bag were indicative of recent activity

at the subject residence.  For, as he inventoried the contents of the trash bag, Deputy Peterson told

Deputy Johnson, that Peterson had "received information prior to this that Rebecca Price and Anthony

Whales [Griffith], had been seen at drug houses in town that both the police department were looking at

also."  While this also does not provide specific temporal information, since Deputy Peterson indicated

that there was an ongoing investigation of those drug houses, it would have been reasonable for Deputy

Johnson to infer that Deputy Peterson's information that Griffith and Price had been seen at drug

---

[22]*Id.* (quoting *Cardall,* 773 F.2d at 1133)).

[23]*United States v. Jackson,* 199 F.Supp.2d 1081, 1093 (D. Kan. 2002) (citing *United States v. Cook,* 854 F.2d 371, 373 (10th Cir. 1988)).

[24]This would not mean that Deputy Johnson could infer that the trash had just been discarded there, however.

houses, was fairly recent information.

Other factors weigh in favor of a finding that the officers acted in good faith despite the insufficient temporal information in the affidavit. Deputies Johnson and Peterson inventoried the contents of the trash bag, finding paper envelopes, containers of acid and other liquids, and a powder substance in the bag. Given that they found paper, powder and containers of liquid, this suggests that the contents of the bag were not deteriorating or decaying; and it suggests that the powder and paper had not been spoiled or fouled by seeping or spilled acid or other liquids in the various containers. In addition, there were 250 pieces of aluminum foil with burnt residue. This suggests that these pieces of foil had not been spoiled or fouled by the acid or any liquid, for there was still burnt residue on the foil. Moreover, the officers were able to read the envelopes of the mail, identifying the addressee. This suggests that the paper envelopes had not been spoiled or fouled by other substances in the trash bag to an extent that rendered them illegible.

All of this, in this Court's view, establishes that the officers acted in good faith, when viewed objectively. The contents of the bag did not suggest that the trash was stale or old. The contents of the bag did not suggest that the trash bag had been exposed, battered, or affected by the weather, or the creek flowing near the culvert. Moreover, Deputy Peterson had knowledge that the defendants had been seen in or around drug houses that were currently under investigation. Given all of these circumstances, and the fact that the magistrate, a legally trained judicial official, signed the warrant, the Court concludes that the officers acted with the requisite good faith contemplated in *Leon,* as reasonably trained police officers would have no objective reason to know that the search was illegal.

Because the officers' conduct was objectively reasonable, exclusion would not further the

purpose of the exclusionary rule.  The executing officers had sufficient information to believe the search

warrant was valid and that evidence of a crime would be found at the location to be searched at the

time of the search.  And any reasonably well-trained officer armed with the same information also

would have assumed that the search warrant was valid.

### B.  The Knock and Announce Requirement

Defendants argue that the deputies executing the search warrant violated statutory and

Constitutional law by failing to knock and announce their presence prior to entering the residence.[25]

Defendants allege that the officers did not knock or announce and there were no exigent circumstances

to justify the no-knock entry.  The government alleges that officers did knock and announce prior to

entering the house.

Where, as here, a court examines the actions of state law enforcement officers during the

execution of a search warrant, it must evaluate those actions in light of the Fourth Amendment's

reasonableness requirement.[26]  Absent exigent circumstances, it is unreasonable for officers to enter a

dwelling without first knocking and announcing their presence.[27]  The knock and announce requirement

under federal law is codified in 18 U.S.C. § 3109.  This statute provides that a law enforcement officer

may:

> break open any outer or inner door or window of a house, or any part
> of a house, or anything therein, to execute a search warrant, if, after
> notice of his authority and purpose, he is refused admittance or when

---

[25]*See Wilson v. Arkansas,* 514 U.S. 927, 931-36 (1995).

[26]*Id.*

[27]*Id.* at 934.

12

necessary to liberate himself or a person aiding him in the execution of
the warrant.

The warrant in this case was issued by a judge and executed by the Coffey County Sheriff's Department.  Under these circumstances, § 3109 does not directly apply, but the Supreme Court has incorporated the requirements of the statute into the Fourth Amendment's reasonableness doctrine.[28]  Thus, the court should apply standards similar to those of § 3109.[29]   Evidence presented at the hearing included Deputy Johnson's testimony and defendant Price's testimony regarding the execution of the search warrant.  Deputy Johnson testified that he, along with other officers, executed the search warrant on defendants' residence on March 24, 2003.  Before the execution of the warrant, the officers had a briefing and discussed that this was a knock search warrant because that was what Deputy Johnson had applied for.  Deputy Johnson testified that when they arrived at defendants' house, Deputy Peterson was in first position at the door, and Deputy Johnson was in third position at the door.  The standard practice is that the first officer knocks and the third officer announces.  Deputy Johnson testified that Deputy Peterson knocked several times followed by Deputy Johnson announcing their presence in a loud voice.  He further testified that the officers entered the house about 10 seconds after knocking.  At this point, Deputy Johnson believed that someone came to the door, but he could not recall whether Price opened the door for them, or whether Deputy Peterson forced entry.  Deputy Johnson further testified that a forced entry would be noted on the report and it was not so noted.

---

[28]*See Id.*

[29]*U.S. v. McCloud,* 127 F.3d 1284, 1286 n.1 (10th Cir. 1997); *U.S. v. Smith,* 63 F.3d 956, 962 (10th Cir. 1995), *judgment vacated on other grounds by* 516 U.S. 1105 (1996); *see State v. Shively,* 999 P.2d 259 (Kan. 2000) (Kansas courts recognize that unannounced entry to execute a search warrant violates the United States Constitution unless exigent circumstances present).

Nevertheless, by the time Deputy Johnson entered the house, Deputy Peterson had defendant Price on the floor handcuffed, so Deputy Johnson proceed through the house to find other occupants and found defendant Griffith in the kitchen laying in a recliner chair with Griffith's son.

Price testified that at the time of the execution of the warrant, she was in the master bedroom and heard nothing until she left the room and met Deputy Peterson who stuck a gun in her face.  She testified that if the deputies had knocked and announced she would have heard them.  She further testified that the deputies did not shout until after they had opened the door; and she did not open the door for them.

Thus, the Court must determine whether the officers knocked and announced prior to forcibly entering the residence, in the same manner as it often decides issues of fact, by evaluating the credibility of the witnesses with conflicting testimony.  Based on the demeanor and substance of their testimony, the Court concludes that Deputy Johnson's testimony is credible and Price's testimony is not.  Deputy Johnson clearly remembers a loud knock and announce at least 10 seconds prior to entry, regardless of whether the occupants of the house heard it.  Price's testimony fails to prove that the deputies did not knock and announce, only that she did not hear it.  The Court accepts Deputy Johnson's testimony that the executing officers did knock and announce their presence and authority before entering the house.

### C.  The Scope of the Search Warrant

Defendants contend that the officers exceeded the scope of the warrant when they seized items not specified in the warrant and that the remedy should be a blanket suppression of all evidence seized during the execution of the warrant.  Specifically, defendants argue that the deputies seized firearms that were not in close proximity to drugs nor used in the safeguarding of drugs as described in the warrant.

14

Defendants also identify numerous other items that were seized but not identified in the warrant as subject to seizure, including: certain books; flags; clothing; and various items allegedly evidencing attempts to modify firearms and manufacture silencers and pipe bombs.

The general rule is that even if the officers exceed the scope of the search, blanket suppression of all evidence seized is not justified unless "there was a flagrant disregard for the terms of the warrant."[30] "In the vast majority of cases, 'a search is not invalidated merely because some things are seized that are not stated in the warrant.'"[31] In this case, the warrant allowed for seizure of:

A. Methamphetamine, in any and all forms
B. Paraphernalia or scales used in the facilitation of weighing narcotics or illegal drugs.
C. Any paraphernalia used to smoke or ingest illegal drugs or narcotics.
D. Any containers packaging materials, plastic bags, or paper folds used to store or conceal illegal drugs.
E. Any guns or weapons that are in close proximity to drugs or may be used in their safeguarding.
F. Any written documentation which would identify the occupants of the residence such as photographs, rent receipts and personal correspondences or which may identify associates in a trafficking organization.
G. Any cash money which may have been obtained through the illegal sale of controlled substances and/or any written documentation of the same.
H. Any materials used in the manufacture of methamphetamine, including but not limited to, ether, rock salt, anhydrous ammonia, ephedrine, and acid.

According to the evidence custody receipt, of the approximately 80 items seized during this search, approximately 17 were items particularly described in the warrant, exclusive of weapons. Approximately another 11 of the seized items were guns or ammunition.

Although defendants argue that the firearms should be suppressed, the warrant allowed for

---

[30]*United States v. Le*, 173 F.3d 1258, 1269 (10th Cir. 1999) (quoting *United States v. Hargus*, 128 F.3d 1358, 1363; *United States v. $149,442.43 in U.S. Currency*, 965 F.2d 868, 875 (10th Cir.1992)).

[31]*Id.*

seizure of "guns or weapons that are in close proximity to drugs or may be used in their safeguarding." It was not unreasonable for the deputies to believe that the weapons found in the house were possibly used for the safeguarding of drugs.

The remaining items seized included: a swastika flag; books on sniper and terrorist activities; notes on militia activity; camouflage clothing and items; components of explosive devices and/or materials to manufacture explosive devices; a computer; and photographs of the Wolf Creek Nuclear Power Generating Station. Deputy Johnson testified that he seized these other items because either they were possibly related to a drug operation or because the deputies had a heightened interest in evidence indicative of militia activity concerning this nuclear power plant, which is located in the same county as the defendants' residence.

The government argues that the items not specified in the warrant were legally seized by virtue of the "plain view" doctrine.[32] To meet this doctrine, the government must satisfy a three-prong test:

> (1) the officer was lawfully in a position from which to view the object seized in plain view; (2) the object's incriminating character was immediately apparent–i.e. the officer had probable cause to believe the object was contraband or evidence of a crime; and (3) the officer had a lawful right of access to the object itself.[33]

Because the Court concludes that the search warrant was valid pursuant to the good faith exception, the deputies had a lawful right to access and examine the property where the items were found. The ideology and militia tracts, the materials that could be used to manufacture explosive devices and

---

[32]*See Coolidge v. New Hampshire*, 403 U.S. 443 (1971).

[33]*United States v. Soussi*, 29 F.3d 565, 570 (10th Cir. 1994) (citing *Horton v. California*, 496 U.S. 128, 136-37 (1990); *United States v. Dixon*, 1 F.3d 1080, 1084 (10th Cir. 1993) (abrogated on other grounds)).

modify weapons, and the photographs of the nuclear power facility were properly seized as items that the deputies had probable cause to believe were evidence of a crime or illegal contraband.[34]

Thus the deputies' search and seizure was within the scope allowed by law and did not amount to a flagrant disregard for the terms of the warrant. Blanket suppression of all evidence seized is not a proper remedy in this case. In any event, in deciding that this evidence will not be suppressed, the Court is not ruling on its admissibility at trial.

## 2. Motions to Suppress Statements

The defendants argue that the statements they made to the deputies at the jail after their arrest should be suppressed. They contend that they were under the influence of methamphetamine at the time of the interviews and were incapable of voluntarily waiving their rights. Griffith also contends that officers should have known that he was possibly sleep deprived at the time of his first interview, which lasted from about 10:00 p.m. until 11:30 p.m, because methamphetamine users sometimes go for days without sleep. In addition to arguing that her waiver of her rights was involuntary, Price contends that officers caused her anxiety and compelled her to speak with them, by precluding her from making phone calls to her children during the two days she was incarcerated. Moreover, both defendants argue that their second interviews were tainted by the involuntary statements made during the first interviews.

---

[34]*See Texas v. Brown*, 460 U.S. 730, 742 (1983) ("[P]robable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false." (internal quote omitted)).

These interviews were audio and video recorded and presented to the Court as evidence.[35] The Court viewed the tapes and finds that neither defendant appeared under the influence of any substance. Griffith was informed of his rights, which he agreed to waive in order to talk to the deputies. He was presented with a written advice of rights form, which he read on his own and signed, signifying his waiver of rights.[36] During his first interview, Griffith stated that he had used methamphetamine at around 11:00 a.m. that day. However, he spoke clearly, answered the officers questions appropriately and made eye contact with the officers. He appeared alert and attentive. During Griffith's second interview, he even drew a schematic of the ammonia manufacturing process for the officers.[37] Griffith did become emotional a few times during both interviews. Each time his son was mentioned and once when he asked about Price, he appeared to cry. But, he quickly recovered and continued answering the officers questions in a straightforward, clear manner. He yawned once at the beginning of the first interview, but he did not appear tired in either interview. The Court's observations correspond with Deputy Johnson's testimony that during the interviews Griffith was calm, articulate, concise, and did not have trouble staying awake. The Court finds that Griffith was not incapacitated or under the influence.

Price's first interview was not recorded, but during the second interview, in which she made statements to the officers, she did not appear to be under the influence of any substance. The officers explained her rights, which she orally agreed to waive; and officers had her read an advice of rights

---

[35]Gov't Ex. #5 & #6.

[36]*See* Gov't Ex #1.

[37]*See* Gov't Ex. #4.

form, which she signed, signifying her waiver of rights.[38]  She stated she had last used methamphetamine two weeks before.  Price even stated she would provide a urine sample, if asked, to prove she had not used drugs that day.  She spoke quietly, but answered the officers questions appropriately.  She became emotional once during the interview, when asked about her source of marijuana.  She did not seem overly upset about the care of her children, stating that it would be best for them to stay with her mother, in whose custody they were at the time of the interview.  This also corresponds with Deputy Johnson's testimony that Price spoke quietly, articulated and acted normally, was not abnormally upset, and in his experience, she did not appear to be under the influence of controlled substances.

The government bears the burden of proving the defendants voluntarily, knowingly, and intelligently waived their *Miranda* rights before it may introduce the defendants' incriminating statements.[39]  To determine the validity of a waiver of these rights, courts must analyze the totality of the circumstances surrounding the interrogation.[40]  Probative factors and circumstances include the defendant's "age, intelligence, and education, and the details of the interrogation, such as whether the suspect was informed of his rights, the length of the detention and the interrogation, and the use or threat of physical force."[41]  The Tenth Circuit has recognized that intoxication could affect the voluntariness of a defendant's waiver of his rights.[42]  Similarly, the voluntariness of a statement made by

---

[38]*See* Gov't Ex. #2 & #3.

[39]*See Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

[40]*See Moran v. Burbine*, 475 U.S. 412, 421 (1986).

[41]*Smith v. Mullin*, 379 F.3d 919, 934 (10th Cir. 2004) (quoting *United States v. Nguyen,* 155 F.3d 1219, 1222 (10th Cir.1998)).

[42]*See United States v. Brown*, 287 F.3d 965, 973 (10th Cir. 2002).

someone under the influence of methamphetamine could be questioned.

After viewing and considering all the evidence, the Court concludes that neither of these defendants were under the influence of methamphetamine at the time they waived their *Miranda* rights; and their statements were voluntary.  Therefore, the statements will not be suppressed.

**3.  Motion to Dismiss for Destruction of Evidence**

Defendants argue that this case should be dismissed because the government destroyed potentially exculpatory evidence.  The items they complain about were destroyed.  Some of these items were first sampled or tested before destruction, as detailed on the Evidence Custody Receipt, which states in pertinent part:

(1) Folgers 3 lb. can with approx. 2 lbs of powder: Sample and Destroy
(2) Glass jar with white powder: Sample and Destroy
(3) Blitz 5 gal. gas can with brass fittings, greenish corrosion: Test and Destroy
(4) White 1.5 Gal. jug with liquid that tested positive for acid: Test and Destroy
(5) 2 lb, can of "Drain out" drain cleaner with sodium Hydroxide: Destroy
(6) Bucket with wet Rock Salt tested positive for acid: Test and Destroy[43]

The first two items were sampled and sent to the Kansas Bureau of Investigation (KBI) lab for testing, which determined that the substances were not controlled substances.  With the exception of item number five, the other items were field tested before being destroyed.  Deputy Johnson testified that the field test performed on these substances was a PH paper test, to determine whether the substance was acidic, basic, or neutral; but the test does not otherwise identify what the substance is.  The items were destroyed because they were acids.  The KBI lab does not accept acids for testing; and the materials are hazardous to store.  So, the deputies photographed the items and documented them before they

---

[43]*See* Ex. A Defs.' Mot. to Dismiss for Destruction of Evidence; Defs.' Ex. #401.

were destroyed.

Defendants allege that since they are denying any attempt to manufacture methamphetamine, destruction of the items denies them the opportunity for independent testing and analysis. However, defendants do not argue how this testing and analysis could be potentially exculpatory. Deputy Johnson testified that rock salt and acids are used in the manufacturing process and the Drain Out drain cleaner can be used as the acid in the manufacturing process. Therefore the items that were destroyed are actually inculpatory, not exculpatory.

A defendant's right to due process is violated if agents destroy evidence that possessed "exculpatory value that was apparent before the evidence is destroyed," regardless of the intent of the agents.[44] A defendant's right to due process can also be violated if the evidence destroyed is not obviously exculpatory, but is potentially useful, and the agents acted in bad faith in destroying it.[45] The evidence destroyed in this case was not obviously exculpatory. Therefore, the officers must have acted in bad faith when they destroyed the items in order for defendants' motion to be granted.

The Court determines that the officers did not act in bad faith when they destroyed the items. They documented the items by photographing them and field testing them, recording their findings. Moreover, the officers obtained a destruction order issued by a magistrate judge for evidence seized during the search of the house.[46] The destruction order required that samples be taken of potential controlled substances. None of the items tested and destroyed were controlled substances, but rather

---

[44]*California v. Trombetta*, 467 U.S. 479, 489 (1984).

[45]*Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

[46]Gov't Ex. #7.

were chemicals possibly used in the manufacture of controlled substances.  As Deputy Johnson testified

at the suppression hearing, the items they destroyed were not sampled and sent to the KBI lab for

testing because they were hazardous materials that the KBI lab would not accept.  These chemicals

were dangerous and could not be stored for safety reasons.  Because this evidence was not apparently

exculpatory and because the evidence was hazardous to store and too hazardous for the KBI lab to

accept, the agents did not act in bad faith in destroying the evidence.  Therefore, defendants' Motion to

Dismiss for Destruction of Evidence will be denied.

### 4.  Motion for a Bill of Particulars

Defendants move for a bill of particulars, seeking an explanation of the conspiracy alleged in

Count 1 of the indictment and identification of the undisclosed and unidentified co-conspirators, aiders

and abettors, and other individuals involved in the criminal acts charged.

Rule 7(f) of the Federal Rules of Criminal Procedure states that a court may issue a bill of

particulars.  The decision to issue a bill of particulars falls within the discretion of the court.[47]  This

discretion is exercised while adhering to the recognized scope of a bill of particulars.[48]  A bill of

particulars is not a discovery device.[49]  It cannot be used to take measure of the government's case.[50]

The purpose of a bill of particulars is to inform the defendant of the substantive facts of the charges

---

[47]*United States v. Kunzman*, 54 F.3d 1522 (10th Cir. 1995).

[48]*United States v. Dunn*, 841 F.2d 1026, 1029 (10th Cir. 1988).

[49]*Id.*

[50]*United States v. Rogers*, 617 F. Supp. 1024 (D. Colo. 1985).

22

against him, but not to discover the evidentiary basis for the charges.[51]  The defendant is not entitled to

know all the evidence the government will use against him at trial.[52]  However, the defendant must be

adequately informed of the charges against him so that he may prepare a defense for trial.[53]

Additionally, a bill of particulars is unnecessary where the information the defendant seeks is available

through "some other satisfactory form," such as an open file discovery policy.[54]

          In order for the defendants to persuade the Court to grant this motion, the defendants must

show, specifically, how they would be prejudiced absent the bill of particulars.[55]  Defendants have

shown no reason why they would be prejudiced absent a bill of particulars.  They have had full

discovery, as the government has made its case file open to them.  Furthermore, the information they

seek, details about the conspiracy and co-conspirators, is not only not properly the subject of a bill of

particulars, they have this information through discovery.  Indeed, the approximate commencement date

of the conspiracy charge is based on information that the defendants provided in their statements to the

government.   This fairly informs the defendants of the charges against them and protects them against

double jeopardy.  The information provided by the government is also sufficient to inform the

defendants of any co-conspirators, aiders and abettors, and other individuals involved in the criminal

acts charged, although the government stated at the hearing that it does not intend to call any co-

---

[51]*United States v. Daniels*, 95 F. Supp. 2d 1160, 1166 (D. Kan. 2000) (citing *Dunn*, 841 F.2d at 1029)).

[52]*United States v. Levine*, 983 F.2d 165, 166-67 (10th Cir. 1992).

[53]*United States v. Higgins*, 2 F.3d 1094, 1096 (10th Cir. 1993).

[54] *Daniels*, 95 F. Supp. 2d at 1166 (citing *United States v. Canino*, 949 F.2d 928, 949 (7th Cir. 1991); *United States v. Sturmoski*, 971 F.2d 452, 460 (10th Cir. 1992)).

[55]*Id.* (citing *Sturmoski*, 971 F.2d at 460).

conspirators as witnesses.  Defendants' motion is denied.

**5.  Motion to Sever**

Defendants move to sever their trials because they have given statements implicating each other. At the hearing, the parties agreed that with the appropriate redaction of the statements, there is no constitutional problem in a joint trial of these defendants.  Thus, the Court denies the motion to sever.

**6.  Motion for Return of Property**

Defendants move, pursuant to Federal Rule of Criminal Procedure 41(g) for a return of all property seized, as a result of an unlawful search and seizure.   In light of the Court's determination that the search and seizure was lawful, this motion is denied.

**IT IS THEREFORE ORDERED BY THE COURT** that defendants' Motion to Suppress Evidence and Statements (Doc. 23), Motion for Bill of Particulars (Doc. 24), Motion to Sever (Doc. 25), Motion to Suppress Statement (Doc. 26), Motion to Dismiss for Destruction of Evidence (Doc. 27), Motion for Return of Property (Doc. 28), and Motion to Suppress Statements (Doc. 44) are DENIED.

IT IS SO ORDERED.

Dated this 1st  day of April 2005.

S/ Julie A. Robinson
Julie A. Robinson
United States District Judge

24